**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DANAE SKIBA** | § | |
| **ON BEHALF OF HERSELF AND** | § | **JURY DEMANDED** |
| **ALL OTHERS SIMILARLY SITUATED,** | § | |
| *Plaintiff* | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO.** |
| | § | |
| **GHG- THE FITNESS GROUP, LLC d/b/a** | § | |
| **GOLD'S GYM HOUSTON; and** | | |
| **GOLD'S GYM FRANCHISING LLC** | § | _____ |
| *Defendants* | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff DANAE SKIBA ("Plaintiff Skiba"), on behalf of herself and all others similarly situated (collectively "Plaintiffs"), files this Original Complaint against Defendants GHG-THE FITNESS GROUP, LLC, d/b/a GOLD'S GYM HOUSTON; GOLD'S GYM FRANCHISING LLC; and T. BRYAN MURPHY, Individually (collectively "Defendants") and would show the Court as follows:

### I.   PRELIMINARY STATEMENT

1.      This lawsuit seeks damages against Defendants for violations of the Fair Labor Standards Act ("FLSA"), as amended. Plaintiff Skiba, on behalf of herself and all similarly situated employees, seeks to recover unpaid salaried wages, statutory liquidated damages, reasonable attorneys' fees and costs, or in the alternative unpaid overtime wages, statutory liquidated damages, reasonable attorneys' fees and costs. See Exhibit 1 (Plaintiff Skiba's Consent to Join). Moreover, Plaintiff Skiba seeks to certify this matter as a collective action under the FLSA.

## II.     PARTIES

2.      Plaintiff Skiba is an individual residing in Harris County, Texas.

3.      Defendant GHG-THE FITNESS GROUP, LLC, d/b/a GOLD'S GYM HOUSTON ("Defendant GHG") is a limited liability company authorized to do business under Texas laws. At all times during Plaintiff Skiba's and the similarly situated employees' employment, Defendant GHG was the employer and/or joint employer of Plaintiff Skiba and the similarly situated employees as defined by 29 C.F.R. § 791.2. Defendant GHG can be served by serving its registered agent, Bryan Murphy, at 6511 FM 1488 Magnolia, TX 77354.

4.      Defendant GOLD's GYM FRANCHISING LLC ("Defendant GGF") is a limited liability company authorized to do business under Texas laws. Defendant GGF's Dallas, TX address is 4001 Maple Ave., Ste. 200 Dallas, TX 75219. At all times during Plaintiff Skiba's and similarly situated employees' employment, Defendant GGF was the employer and/or joint employer of Plaintiff Skiba and the similarly situated employees as defined by 29 C.F.R. § 791.2. Defendant GGF can be served by serving its registered agent, Corporation Service Company d/b/a CSC Lawyers Incorporated, at 211 E. 7th Street, Suite 620, Austin, TX 78701.

5.      Defendant T. BRYAN MURPHY ("Defendant Murphy") is an individual. Defendant Murphy can be served at 10434 Clubhouse Circle, Kingwood, TX 77345. At all times during Plaintiff Skiba's and the similarly situated employees' employment, Defendant Murphy was the employer and/or joint employer of Plaintiff Skiba and the similarly situated employees as defined by 29 C.F.R. § 791.2.

## III.     JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b), which provides, "An action to recover liability prescribed in either of the preceding sentences may be maintained against any employer . . . in any federal or state court of competent jurisdiction by any one or more employees for and on behalf of herself and themselves and other employees similarly situated." In addition, this Court has jurisdiction over the subject matter under 28 U.S.C. § 1331 because the claims arise under laws of the United States.

7.      Venue is proper pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.    FLSA COVERAGE

8.      At all times pertinent to this Complaint, Defendants have acted, directly or indirectly, in the interest of an employer and/or joint employer with respect to Plaintiff Skiba and the similarly situated employees.

9.      At all times hereinafter mentioned, Defendants have been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. §203(d).

10.      At all times hereinafter mentioned, Defendant GHG and Defendant GGF have been an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. §203(r).

11.      At all times hereinafter mentioned, Defendant GHG and Defendant GGF have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §203(s)(1), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000 (exclusive of excise taxes at the retail level which

are separately stated).

12.     At all times hereinafter mentioned, Plaintiff Skiba and the similarly situated employees are individual employees who were engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. §206-207.

## V.     FACTUAL ALLEGATIONS

13.     Defendants provide fitness facilities and personal training services to individuals at Defendants' various locations.

14.     Defendant T. BRYAN MURPHY is the CEO/President of Defendant GHG-The Fitness Group, LLC and possesses the following abilities: (1) the power to hire and fire employees; (2) the power to supervise and control employee work schedules or conditions of employment; (3) power to determine the rate and method of pay; and/or (4) power to maintain employment records.

15.     Defendants have employees in the following Texas cities: Houston, Humble, Kingwood, Magnolia, Austin, Conroe, and The Woodlands. According to Defendant GGF's website, Defendants have twelve (12) locations in Austin, and approximately twenty-one (21) locations in San Antonio.

16.     From approximately November 12, 2019 to the date this Original Complaint was filed, Defendants employed Plaintiff Skiba as a purported salaried employee under the "Fitness Manager" title at the Humble, TX—"Parks Lake" location.

17.     Defendants employ a number of similarly situated employees as purported salaried and exempt employees, assigned to work at Defendants' various locations within Texas.

18.     Plaintiff Skiba was initially informed that her job duties would qualify her for full time, non-exempt status. Furthermore, Plaintiff Skiba was informed that she would be paid

as a salaried employee with the potential to earn additional sales commissions and monthly bonuses should she meet predetermined production goals.

19.     On or about Plaintiff Skiba's November 2019 hiring date, Defendants informed Plaintiff Skiba that they were interested in improving production, and that they were open to new ideas and flexible options for Fitness Managers. With the intention of heading in a new direction for the team, Defendants informed Plaintiff Skiba that they were interested in providing a flexible environment for Plaintiff Skiba's in the Fitness Manager position allowing her to take full advantage of the facility's busiest hours.

20.     To this end, and in support of restructuring efforts, on December 10, 2019, VP of Fitness and wife of Defendant Murphy, Kristi Murphy, emailed then General Manager, Donald Lewis, and copied CEO/President, Defendant Murphy, informing him that Plaintiff Skiba would be permitted a flexible schedule allowing her to take advantage of peak customer hours. For several months following Kristi Murphy's approval, Plaintiff Skiba exercised this flexible schedule, working early hours and late evenings on occasion all while making accommodations for orientations.

21.     In Plaintiff Skiba's position as Fitness Manager, she was tasked with several duties including hiring and firing employees, training Physical Trainers, and assuring production goals were reached; however, this role came with uncertainty regarding who Plaintiff Skiba was actually managing.

22.     While Plaintiff Skiba was originally assigned to manage one Assistant Fitness Manager, and several Physical Trainers, Defendants' policy made managing Physical Trainers difficult. As part of a Fitness Manager's duties, Plaintiff Skiba was tasked with explaining the pay structure to her subordinates when asked; however, given the uncertainty of Physical

Trainers' status with the company, Plaintiff Skiba found herself with her own questions.

23.     Despite recent attempts at switching exclusively to full-time Physical Trainers, Defendants failed to do so, leaving Plaintiff Skiba responsible for explaining the discrepancy to staff. More specifically, while Defendants wished to hire exclusively full-time Physical Trainers, this proved impossible given the standards required for these employees to qualify as full-time employees.

24.     As explained by Account Manager, Ashley Sudwischer, Physical Trainers' hours were tracked in two separate time keeping systems. One system was specifically designated for Physical Trainers' "Floor Hours," or time used to try to obtain new clients, while the other system was exclusively limited to hours worked during paid training sessions with clients.

25.     To qualify as a full-time employee under Defendants' pay structure, a Physical Trainer was tasked with completing one month containing the following metrics: a total of seventy (70) thirty-minute paid sessions per week; a total of one hundred and forty (140) paid sessions per pay period; and a total of two hundred and sixty (260) paid sessions per month. Only after reaching this threshold would a Physical Trainer then qualify as full-time. In total, the hours required to achieve full-time status for a Physical Trainer were 35 hours per week, 70 hours per pay period, and 130 hours per month. Only after achieving these metrics could a Physical Trainer qualify for benefits and PTO as a full-time employee.

26.     Furthermore, after achieving full time status, a Physical Trainer stood to lose this status, benefits, and PTO should he or she fall below a total of 35 hours' worth of paid training sessions per week.

27.     Understanding that these metrics were nearly unachievable, even for the most

successful Physical Trainer, Plaintiff Skiba found it irresponsible to hire Physical Trainers under the false pretense that they would be full-time employees. As such, Plaintiff Skiba continued to hire part time Physical Trainers, and only managed one Physical Trainer whom she believed may qualify as a full-time employee, so long as he maintained paid customer sessions totaling at least 35 hours per week.

28.     In a short time period, Plaintiff Skiba successfully led the Humble, TX location in the direction which Defendants' had hoped, performing to budget at around 80% by January – a far leap from the prior 20-30% the location had been reporting before Plaintiff Skiba's arrival.

29.     As was required of all staff, Plaintiff Skiba, tracked her hours daily through a computerized time keeping system. However, due to her alleged exempt status, these hours were not taken into account when Defendants calculated her pay. Instead, Plaintiff Skiba was set to receive a prorated amount of her annual salary to be paid bi-monthly. However, despite what should have been a predetermined amount of pay, Plaintiff Skiba continuously received unpredictable, variable pay each period despite being classified as exempt.

30.     On or about January 2020, Plaintiff Skiba noticed that Defendants were applying inconsistent and unclear metrics to Physical Trainers under her supervision. More specifically, Plaintiff Skiba determined that she had never received a clear explanation for the manner in which Physical Trainers were to be paid. Based on the manner in which the company was compensating these trainers, Plaintiff Skiba determined that they may not actually be eligible for full time status.

31.     In addition to the confusion surrounding Physical Trainers' compensation, Plaintiff Skiba also noticed an immense amount of variation in her bi-monthly paystubs. More

specifically, Plaintiff Skiba noticed that several PTO requests had been submitted, without her knowledge, on days when she was not absent for the entire workday.

32.     As such, Plaintiff Skiba addressed these concerns with her superiors, Defendant Murphy and Kristi Murphy, asking for clarity regarding the continuously varying pay structure despite her salaried and exempt status. Despite having received notice of this issue, Defendants failed to investigate Plaintiff Skiba's concerns, instead insisting that the pay period process was being applied appropriately.

33.     However, according to Defendants' own Employee Handbook, in the event that partial absences occurred, the employee's PTO hours would then be applied to cover the employee's absence. Should an employee have insufficient PTO hours to cover the absence, only then did Defendants state that the employee's pay would be calculated as hourly. However, this was not the case.

34.     Notwithstanding the boundaries set out in its own Employee Handbook, and as evidenced in Plaintiff Skiba's paystubs, Defendants misapplied PTO hours to days when employees were absent for less than a full workday and for illness related absences. Furthermore, after misapplying PTO and resorting to an hourly pay rate, Defendants also failed to keep proper records, thus leading to Plaintiff Skiba being paid for less hours than those actually worked.

35.     Unsatisfied with the lack of consistency between her pay and the explanation she received, Plaintiff Skiba soon followed up with Account Manager, Ashley Sudwischer, only to receive another contradictory explanation mimicking Defendant Murphy's and Kristi Murphy's.

36.     Frustrated with the lack of a clear explanation for the discrepancy, on February

6, 2020, Plaintiff Skiba followed up in an email to, Sarah Dailey, in Defendants' corporate office, asking for a clear explanation regarding compensation for Physical Trainers, Assistant Fitness Managers, and Fitness Managers.

37.    In response to Plaintiff Skiba's inquiries, Dailey parroted the previous explanations given to Plaintiff Skiba, informing her that compensation plans for Fitness Managers and Assistant Fitness Managers were issues better addressed by Defendant Murphy, Kristi Murphy, or Ashley Sudwischer.

38.    Shortly following her inquiries, Plaintiff Skiba continued receiving paystubs which were not reflective of her timesheets nor her absences. On or about March 16, 2020, while the facility was closed due to COVID-19 related orders, Plaintiff Skiba and other similarly situated employees, were notified that they were to come back into work that day.

39.    As expected, the closed facility meant a lack of work for staff. Due to the facility's lack of customers, and an overall lack of work, Plaintiff Skiba and similarly situated employees were then forced to remain in the facility between five to eight hours without being paid a full day's salary, yet again shifting between exempt and non-exempt requirements at a whim due to no fault of Plaintiff Skiba or her fellow employees.

40.    The following day, Plaintiff Skiba and several other employees were given notice that they would need to clean and sanitize the facility in preparation for the facility's eventual reopening. Complying with these wishes, Plaintiff Skiba and several other employees arrived to sanitize the facility with limited protective gear to protect them from contamination, only to once again receive less than a full day's salary.

41.    Shortly thereafter on or about March 24, 2020, Plaintiff Skiba was called in yet again along with several other employees. Despite the facility still being closed and all

employees having been officially furloughed that day, Plaintiff Skiba and the others were forced to remain at the facility for a full day with no work to perform, and receiving only hourly pay for their time.

42.     On or about May 11, 2020, Plaintiff Skiba was notified via email to come in yet again while still "furloughed." With the false premise that employees would be preparing the Humble, TX location for eventual reopening, Defendants instructed Plaintiff Skiba to report to her standard location.

43.     Despite these instructions, when Plaintiff Skiba and the remaining employees arrived at the Humble, TX location, they were then informed that they would be traveling to the Kingwood location. Once present at the Kingwood location, Plaintiff Skiba and the remaining employees were then instructed to assist with moving heavy machinery and help load it onto a truck to be swapped with the equipment from the recently closed Houston – Cypress Landing location. Without warning, the employees reported to work prepared to sanitize the facility only to be met with intense manual labor.

44.     In addition to the surprise assignment, employees were not provided any type of protective equipment, masks, gloves, or sanitizer and were unable to adhere to any form of social distancing.

45.     On or about May 18, 2020, Defendants ended the furlough period, and notified employees that they would now be required to return. In exchange for the hours worked throughout the "furlough" period while having been compensated at an hourly rate instead of the standard salary pay, Defendant Murphy assured employees that they would receive additional PTO.

46.     Following the close of the furlough period, General Manager, Joseph Ageitos,

was transferred from the Houston – Cypress Landing location to replace former General Manager, Donald Lewis. Shortly after joining the Humble, TX location, and without warning, Ageitos began taking issue with Plaintiff Skiba's well established flexible schedule.

47.     Disregarding Plaintiff Skiba's assurances that her flexible schedule had been approved by Kristi Murphy, Defendant Murphy, and former General Manager, Donald Lewis, Ageitos insisted that Plaintiff Skiba get further confirmation to continue using this schedule.

48.     On or about June 17, 2020, Plaintiff Skiba informed Defendant Murphy and Kristi Murphy that Ageitos was giving her difficulty regarding her schedule, and that he sought further confirmation. However, rather than referring back to their December 2019 email communications, both Kristi and Defendant Murphy pushed back. Defendant Murphy deferred to Kristi stating that he recalled no such conversation, while Kristi insisted that she never intended for such a schedule to be permanent. Despite having never challenging this schedule since its inception in December 2019, Kristi and Defendant Murphy sided with Joseph, the new General Manager, criticizing Plaintiff Skiba's schedule and overall performance implying that a flexible schedule no longer suited the business.

49.     In addition to newly formed issues with Plaintiff Skiba's schedule, Defendant Murphy began referencing workplace gossip regarding Plaintiff Skiba's alleged wavering loyalty to the Defendants as it was purported that she was seeking other employment in Dallas, TX. Refusing to address any of Plaintiff Skiba's past concerns regarding the instability of the pay policies, Defendant Murphy created issues where none existed.

50.     Just one month following her conversations with her superiors about these reoccurring pay discrepancies and varied pay amounts for purported exempt employees, Plaintiff Skiba now faced new and unexpected pushback regarding her overall performance,

alleged intentions to leave the company, and her interactions with her superiors – all of which were unfounded.

51.     In addition to the heightened tension with Defendant Murphy and Kristi Murphy, Plaintiff Skiba also received pushback from other higher-ranking employees with whom she had once had an amicable relationship. In a June 23, 2020 email to VP of Operations, Dionne Booker, Plaintiff Skiba asked for Booker's opinion on ongoing challenges and how to best work with participants who wished to complete the fitness programs remotely due to the pandemic. Rather than provide assistance as she had often done in the past, Booker prompted Plaintiff Skiba to get more creative, offering no alternative solutions. Considering the relationship Plaintiff Skiba once had with Booker, she found it not to be a coincidence that Booker had withdrawn some since Plaintiff Skiba's struggle with Defendant Murphy and Kristi Murphy.

52.     Despite heightened tension with Defendant Murphy and Kristi Murphy, and pushback from newly transferred General Manager, Joseph Ageitos, Plaintiff Skiba continued working to meet her projected goals. In spite of voicing her concerns, her paystubs remained nonreflective of a salaried employee's pay, and were miscalculated under the hourly standard.

53.     For several pay periods spanning from December 2019 to the present, including the pay period beginning on July 1, 2020 and ending on July 15, 2020, Defendants misapplied PTO to partial absences and illness-related absences. More specifically, on July 2, 2020, Plaintiff Skiba's arrival and departure from work were not accurately reflected in her total hours. Specifically, on that day, Plaintiff Skiba worked from 8:57 a.m. to 7:06 p.m. – a total of 10.15 hours. However, Plaintiff Skiba's total amount of hours reflected on the timesheet for July 2, 2020 are erroneously reported as 8.17 hours. A miscalculation calling into question all of Plaintiff Skiba's timesheet entries as far back as her hiring date.

54.     During the same pay period, Defendants further misapplied PTO to several other days when Plaintiff Skiba missed only a few hours of work. As such, for the time period beginning on July 1, 2020 and ending on July 15, 2020, Plaintiff Skiba's pay was calculated using an hourly rate. Therefore, in addition to this hourly rate being misapplied, Plaintiff Skiba was also underpaid due to the improper calculation of her total hours worked.

55.     These types of miscalculations can be seen throughout the duration of Plaintiff Skiba's employment with Defendants, resulting in several pay periods wherein Defendants failed to compensate Plaintiff Skiba her full salaried pay, all while paying her hourly for an inaccurate number of hours worked.

56.     Despite several attempts at discussing these issues, Plaintiff Skiba's inquiries went ignored. Rather than investigate Plaintiff Skiba's concerns, Defendants accused her of insubordination and disrespect while willfully ignoring her complaints. On several occasions, Plaintiff Skiba suggested an in-person meeting to speak with her superiors about each party's concerns. However, Defendants refused to meet with Plaintiff Skiba instead choosing to further isolate her and hold her to heightened standards not applied to other employees.

57.     Despite several attempts at moving forward and finding a resolution with her superiors, on July 2, 2020, Plaintiff Skiba requested her pay records from Defendants. Later that day, Plaintiff Skiba then received a formal Write-Up for alleged insubordination to a total of three superiors due to her emails in which she asked to meet to resolve their issues in person.

58.     Upon receiving this Write-Up, Plaintiff Skiba responded to the insubordination allegations, assuring that she had no intention to disrespect her superiors with her inquiries. Instead, Plaintiff Skiba called attention to the fact that she had persisting questions which remainder unanswered, and that she felt that she was being targeted due to said complaints.

59.     After receiving the July 2, 2020 Write-Up, Plaintiff Skiba knew that Defendant Murphy and Kristi Murphy were unwilling to take any action to correct the unpaid wage issues. As such, Plaintiff Skiba attempted to forego them, making another complaint to Accounting Manager, Ashley Sudwischer about unpaid wages.

60.     In several email communications with Sudwischer and Plaintiff Skiba, she was routinely redirected to the Employee Handbook, which expressly stated that employees missing a full day of work for anything other than illness would be required to use PTO to cover the absence. In response to Sudwischer's explanation, Plaintiff Skiba called attention to the fact that on several occasions, PTO was erroneously applied to partial absences or illness-related absences.

61.     When asked about how PTO could be applied to a day when Plaintiff Skiba did in fact work at least a partial day, Sudwischer informed Plaintiff Skiba that, "It wouldn't make sense for the company to pay an employee for a full day's work if they clocked in for 5 minutes then left, unless it was due to the company closing like with COVID-19." Notwithstanding the clear contradiction in policy and practice, in her July 8, 2020 email response to Plaintiff Skiba, Sudwischer assured Plaintiff Skiba that the policy and her paystubs were in fact correct, making no effort or offer to review these records.

62.     Seeking further information regarding her pay inaccuracies and the lack of consistence with the Employee Handbook, Plaintiff Skiba followed up several more times with Sudwischer asking about the various discrepancies in the ways in which PTO was applied, when it was applied, and the overall lack of consistence. However, during these communications, Plaintiff Skiba received the same response.

63.     Despite her efforts, the inconsistent payments persisted. The morning of July 13,

2020, while two employees had already called in sick while awaiting results of their COVID-19 tests, Plaintiff Skiba called in complaining of a sore throat. After taking allergy medication, Plaintiff Skiba reported to work, just one and one-half hours after her scheduled start time. Despite calling in ahead of time and completing the remainder of her workday, Plaintiff Skiba later discovered that Defendants applied PTO to her late arrival, once again violating their own policy.

64.     With a total of three employees currently awaiting results of COVID-19 tests, Plaintiff Skiba's complaints regarding unpaid wages remains even less of a priority than before. As it stands, Plaintiff Skiba continues to receive less than the required amount she is entitled to as a purported full time, exempt employee.

## VI.     FIRST CAUSE OF ACTION: UNLAWFUL DEDUCTION OF WAGES UNDER FLSA, 29 C.F.R. §§ 541.602- 603

65.     The preceding paragraphs are incorporated by reference herein for all purposes.

66.     The improper deductions from salary provisions set forth in 29 C.F.R. §§ 541.602-603, and the supporting federal regulations, apply to Defendants and protect Plaintiff Skiba and the putative class members.

67.     Furthermore, 29 C.F.R. §541.602 states that deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons not including illness or disability.

68.     Furthermore, §541.603(b) provides that an employer who improperly deducts from an exempt employee's salary shall lose said exemption so long as facts indicate that that the employer lacked the intention to pay the employees on a salary basis.

69.     On several occasion throughout Plaintiff Skiba's employment, Defendants

misapplied PTO to partial absences of less than a full day, including those stemming from illness. As a result, several dates upon which Defendants applied PTO and resorted to hourly pay were days in which Plaintiff Skiba received less than the full day's pay to which she was entitled.

70.     In addition to wrongfully applied PTO, Defendants also erroneously calculated Plaintiff Skiba's hourly wages, with frequent discrepancies between Plaintiff Skiba's actual hours recorded and the total amount of hours for which she received compensation.

71.     Considering Defendants' knowledge of Plaintiff Skiba's complaints regarding unpaid wages, Defendants' defense of the pay structure, and Defendants' failure to rectify these discrepancies, it remains evident that Defendants' failure to pay wages was intentional and indicated an overall lack of intention to pay Plaintiff Skiba and similarly situated employees salaried wages. As such, Defendants must lose their exempt status as it is applied to Plaintiff Skiba and similarly situated employees, thus entitling said employees to overtime compensation of one and one-half standard wages for overtime hours worked over the course of their employment.

## VII.     SECOND CAUSE OF ACTION: UNPAID OVERTIME WAGES UNDER FLSA, 29 U.S.C. § 201 *et. seq.*

72.     In the alternative, Plaintiff Skiba asserts that Defendants misclassified her and similarly situated employees as exempt employees. As such, the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 201 et. seq., and the supporting federal regulations, apply to Defendants and protect Plaintiff Skiba and the putative class members.

73.     Whether an employee falls within an exemption is a question of law; the amount of time the employee devotes to particular duties, as well as the significance of those duties, are

questions of fact. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986).

74.     The FLSA requires each covered employer to compensate all non-exempt employees at a rate of not less than one and one-half times their regular hourly rate for all hours worked in excess of forty (40) hours per week.

75.     Throughout the relevant period, Defendants misclassified non-exempt employees as exempt employees in an effort to avoid compensating said employees for the excess hours worked over forty (40) hours per week. Furthermore, Defendants failed to pay Plaintiff Skiba and other similarly situated employees' wages at time-and-a-half for hours that they worked over forty (40) hours in a workweek.

76.     Throughout the relevant period, Defendants expected and required Plaintiff Skiba and the putative class members to be available to work more than forty (40) hours in a workweek, on several occasions even calling these employees to work during a Governor ordered shut down of the facility due to COVID-19 while supposedly furloughed.

77.     As a result of Defendants' unlawful acts, Plaintiff Skiba and the putative class members have been deprived of overtime compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation.

78.     Defendants' unlawful conduct has been willful and intentional. Considering the various occasions during which these discrepancies were brought to their attention, Defendants were aware or should have been aware that the practices described herein are unlawful. Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff Skiba and the putative class members.

79.     Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

## VIII. THIRD CAUSE OF ACTION: FAILURE TO MAINTAIN ACCURATE RECORDS

80.     Plaintiff reasserts and incorporates by reference all of the above numbered paragraphs.

81.     The FLSA requires employers to keep accurate records of hours worked by employees. 29 U.S.C. § 211(c); 29 C.F.R. § 516.

82.     Defendants failed to keep proper time records by unlawfully deducing Plaintiff Skiba's and other similarly situated employees' pay and misapplying PTO to less than a full day's absence or a non-illness related absence. Furthermore, Defendants also failed to keep proper time records by then compensating Plaintiff Skiba and other similarly situated employees at an hourly rate which did not accurately reflect the total recorded hours worked by each employee.

83.     In the alternative to the pay violations of the FLSA described above, Defendant failed to keep proper time records as required by the FLSA by maintaining records wherein Plaintiff and other similarly situated employees were misclassified as exempt.

## IX. *THIRD CAUSE OF ACTION:* RETALIATION UNDER FLSA, 29 U.S.C. §215(a)(3)

84.     Defendants have retaliated against Plaintiff Skiba following her complaints of unpaid wages and pay discrepancies in violation of 29, U.S.C. § 215(a)(3).

85.     To establish a prima facie case of FLSA retaliation claim, a plaintiff must show the following: (1) she participated in protected activity under the FLSA; (2) she suffered an adverse employment action; and (3) a causal link exists between the activity and the adverse

action suffered. *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008) (emphasis and quotation omitted).

86.     Furthermore, the plaintiff must also prove by a preponderance of the evidence that but for her participation in protected activity, the adverse employment action would not have occurred. *Kanida v. Gulf Coast Med. Pers*. LP, 363 F.3d 568, 580 (5th Cir. 2004).

87.     As previously stated, Plaintiff Skiba engaged in protected activity under FLSA when she complained several times to Defendants regarding uncertainty regarding exempt statuses or lack thereof for Physical Trainers, as well as varying pay amounts for alleged exempt employees and unpaid wages. In addition to complaints regarding these matters, Plaintiff Skiba also called attention to the misuse of PTO to absences of less than a full day's work or for illness. After her complaints and requests for pay records, Defendants' behavior towards Plaintiff Skiba shifted resulting in more harsh treatment towards Plaintiff Skiba, heightened criticisms, and false accusations. Shortly after her complaints, Plaintiff Skiba was accused of searching for outside employment, being less than committed to her position with the company, and was targeted more harshly than other employees regarding strategic plans which other employees were not held to.

88.     Furthermore, on the same day that Plaintiff Skiba requested her pay records from Defendants, Plaintiff Skiba received a formal Write-Up threatening suspension without pay, and even termination, for "insubordination" against the very superiors to whom she had once mentioned pay the pay discrepancy.

89.     The adverse employment actions Plaintiff Skiba faced were undoubtedly linked to her complaints regarding unpaid wages and misclassifications of herself and other employees. Prior to Plaintiff Skiba's complaints, she was a top performer with the company,

improving production by more than 50% in under three months of employment. Additionally, Plaintiff Skiba was once permitted to employ a flexible schedule allowing her to take advantage of peak hours and avoid unnecessary overlapping with other staff. Following her complaints, Plaintiff Skiba was not only written up and threatened with termination, but she also was treated as though her performance was suffering despite its remaining steady. Furthermore, Plaintiff Skiba was prohibited from employing a flexible schedule, thus making attainment of her performance goals increasingly more difficult. But for Plaintiff Skiba's complaints, she would not have received the adverse employment actions leading to her near termination.

90.     For these reasons, Plaintiff Skiba can clearly establish a prima facie case of retaliation under 29, U.S.C. § 215(a)(3).

## X.     COLLECTIVE ACTION UNDER 29 U.S.C. § 216(b)

91.     The preceding paragraphs are incorporated by reference herein for all purposes.

92.     Pursuant to 29 U.S.C. §216(b), Plaintiff Skiba brings this  Complaint as a collective action, on behalf of herself and all persons similarly situated who consent to join this litigation by filing a written consent with the Court and who  also agree to be represented by Plaintiff Skiba's counsel, such persons making claims under the FLSA for the three years preceding the filing of this Complaint or the filing with the Court of each such person's written consent to join until entry of judgment after trial.

93.     Defendants have a common policy of allowing exempt employees' compensation to be deduced for absences of less than a full day and for absences related to illness. Furthermore, Defendants maintain a policy wherein purported exempt employees stand to lose this status at any point if their hours fall below a certain amount of hours per week, thus providing said employees with a non-predetermined, variable pay amount reliant upon hours

worked per pay period, rather than a predetermined salary.

94.     Given Defendants' misclassifications and improper application of PTO, Defendants are prohibited from benefiting from the exempt status they currently bestow on employees who do not fulfill the requirements to qualify as such. While these employees are underpaid under the exempt status, in the alternative, they have also been underpaid under the non-exempt status entitling them to time and one-half their regular pay rate for hours worked in excess of forty (40) hours per work week.

95.     In addition to failing to pay requisite time and one-half regular pay rate for overtime hours, Defendants have failed to pay the standard regular rate of pay for hours worked according to its own employee time tracking system.

96.     Therefore, the Court should certify a collective action of all exempt employees whose pay has been unlawfully reduced due to absences of less than one full day of work or for illness related reasons. Furthermore, the Court's certification of this collective action should also include non-exempt employees who were not compensated at time-and-a-half for hours that they worked over forty (40) hours in a workweek, or who received compensation during a pay period which was not reflective of the actual hours recorded by said employees, and that worked at any time during the three years preceding the filing of this Original Complaint.

97.     Plaintiff Skiba is informed and believes, and based thereon, alleges that there are other FLSA class members who could "opt-in" to this class.

98.     Additionally, the actual number of FLSA class members is readily ascertainable by a review of Defendants' records through appropriate discovery, and Plaintiff Skiba proposes to take proceedings in this action to have such persons notified of this litigation and given an opportunity to file written consents to join this litigation.

## XI.     JURY TRIAL DEMAND

99.      Plaintiff Skiba, on behalf of herself and members of the putative class, demand a jury trial on all issues so triable.

## XII.     PRAYER

100.      Plaintiff Skiba, on behalf of herself and all similarly situated employees, respectfully requests that the Court certify this case as a collective action under the Fair Labor Standards Act and order court-supervised notice to the class and further demands judgment against Defendants for the following:

(a)      actual damages for unpaid overtime wages under the FLSA;

(b)      liquidated damages as provided by the FLSA;

(c)      reasonable attorney's fees under the FLSA;

(d)      pre-judgment and post-judgment interest as provided by law;

(e)      all costs of court; and

(f)      any other relief to which Plaintiff Skiba is and members of the putative

class may be entitled, whether in law or in equity.


Respectfully submitted,

**The Ilochi Law Firm**
11601 Shadow Creek
Pkwy., #111-325
Pearland, Texas 77584
Phone: (713) 487-9072

BY: /s/ Gabrielle O. Ilochi
ATTORNEY-IN-CHARGE
State Bar No.: 24107815
SDTX Bar No.: 3256155
Email: gabrielle@ilochilaw.com

**ATTORNEY FOR PLAINTIFF**